IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MILLICENT CARVALHO-GREVIOUS, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DELAWARE STATE UNIVERSITY, )<br>JOHN AUSTIN, and ALTON THOMPSON )<br>)<br>Defendants. )<br>) | C.A. No. 13-1386 |

## **MEMORANDUM**

### I. **INTRODUCTION**

The plaintiff, Millicent Carvalho-Grevious ("Grevious"), filed a Complaint (D.I. 1) against Delaware State University ("DSU"), John Austin ("Austin"), and Alton Thompson ("Thompson") (collectively, "Defendants") on August 2, 2013. Grevious filed a First Amended Complaint (D.I. 7) on September 25, 2013, and a Second Amended Complaint (D.I. 18) on October 27, 2014. Grevious alleges that the Defendants unlawfully retaliated against her, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII") as to DSU, and in violation of 42 U.S.C. § 1981 as to Austin and Thompson. (D.I. 18 at ¶¶ 38, 40.) On June 5, 2015, the Defendants filed a Motion for Summary Judgment (D.I. 35), asserting that Grevious cannot succeed on her claims because she cannot satisfy the "but for" standard of causation (*id.* at 1). For the reasons that follow, the court will grant the Defendants' motion.

### II. **BACKGROUND**

#### A. **Grevious begins work at DSU**

On August 16, 2010, DSU hired Grevious as an Associate Professor and Chairperson of the Department of Social Work. (D.I. 37, Ex. 2.) The faculty position was tenure-track, and the

Chairperson position was a one-year appointment. (D.I. 42, Ex. B at 4–5.) Her duties as Chairperson included "managing the academic department, administering department matters, running department faculty meetings and such other duties as customarily held by a faculty chair." (*Id.*) She reported to Austin, who was then interim Dean of the college of Education, Health and Public Policy, and Austin reported to Thompson, the University Provost. (D.I. 36 at 4.) Grevious met regularly with Austin. (D.I. 42, Ex. A at 215:22–216:13.)

Not long after Grevious began working at DSU, conflicts arose between her and several Department faculty and staff. (*See* D.I. 37, Exs. 4–9.) In the first three months, Austin received written complaints from an Administrative Assistant, the Director of Field Instruction, and an Assistant Professor, who each felt that Grevious had personally attacked them and questioned their professional competence. (*Id.*, Exs. 4–7.) Another faculty member requested the president of the DSU chapter of the American Association of University Professors to intervene after Grevious instructed her "not to send any emails to any faculty member, staff member, or student without [her] prior approval." (*Id.*, Ex. 9.) In total, Grevious recommended that the Department terminate five employees: two recently-hired faculty members, two staff members, and a department consultant. (D.I. 38, Ex. 1 at 40:24–41:11; D.I. 37, Ex. 8.)

### B. Informal Complaints to Provost

On January 20, 2011, Grevious asked to schedule a meeting with Thompson concerning Austin's "interference with departmental governance." (D.I. 37, Ex. 11.) She claimed that Austin had mounted a campaign to have her removed as Chairperson. (*Id.*) On January 25, Grevious requested a meeting with Associate Provost Bradley Skelcher. (*Id.*, Ex. 12.) In her email, she claimed that Austin's denial of her travel request form was "further proof that Dr. Austin is

2

working an agenda to undermine the effectiveness of [her] role as department chair." (*Id.*) Grevious did not make any mention of gender or race discrimination in her January 20 or 25 messages.

On January 27, Grevious sent Thompson another email complaining about Austin's "unilateral and arbitrary management style." (*Id.*, Ex. 13.) She claimed she had "experienced some retaliation" as a result of her attempts to discuss her concerns with Austin. When she tried to discuss the issues with him, Austin allegedly responded that "his management style was meant to stop back biting among women, especially Black women." (*Id.*) Thompson replied that he regretted the conflicts between Grevious and Austin, and that the behavior Grevious complained of was "not acceptable for a senior administrator." (*Id.*) He met with Grevious on January 31. (D.I. 42, Ex. I.)

On February 14, Thompson met with Austin to discuss Grevious' concerns. (*see id.*, Ex. J.) The next day, Austin completed a Chairperson Evaluation for Grevious. (*Id.*, Ex. K.) Grevious felt the evaluation was inconsistent with her actual performance and "full of personal misrepresentation and lies." (*Id.*, Ex. M.) After she met with him to discuss the evaluation, Austin submitted a revised, more positive evaluation on February 16. (*Id.*, Ex. C at 65:20–66:9; Ex. L.) On February 17, Thompson told Grevious that Austin had denied making inappropriate comments, but Thompson "encourage[d] him to always be very professional with [her] and other faculty and staff going forward." (*Id.*, Ex. I.)

In a series of emails between February 8 and February 16, Grevious asked Thompson to intervene in the upcoming faculty vote on whether to remove her as Chairperson. (*Id.*, Ex. 14.) Grevious again claimed that Austin was manipulating the election by asking faculty members to vote against her "without justified reasons, except to retaliate against [her]." (*Id.*) She repeated her concerns with "Dr. Austin making inappropriate derogatory ethnic comments" and also claimed

3

that Austin had "misappropriated departmental funds." (*Id.*) She said the "retaliation" from Austin had "escalated," resulting in a Chairperson evaluation "that ignored all the work that [she had] done for the department." (*Id.*) Thompson declined to intervene in the election (*id.*), and on February 16, the faculty voted 5-4 to replace her as Chairperson. (*Id.*, Ex. A at 22:22–23:5.)

### C. Formal Grievances

On February 23, Grevious filed a formal grievance against Austin with the Office of the Provost alleging, among others things, that Austin retaliated against her for reporting sexual harassment by giving her a bad Chairperson evaluation. (*Id.*, Ex. N.) On March 22, the Office of the Provost closed its investigation, finding "no evidence of retaliatory action on Dr. Austin's behalf having seen no evidence to substantiate the claim." (*Id.*, Ex. P.) On April 1, Grevious received a formal offer for a renewable contract. (*Id.*, Ex V.)

On April 14, Grevious filed a Sexual Harassment and Retaliation complaint with Human Resources ("HR"). (*Id.*, Ex. R.) Her nine-page complaint largely outlined disagreements and disputes regarding Austin's management style and interference with her execution of her Chair duties. She repeated her earlier claims regarding Austin's derogatory statements about Black women,[1] and claimed that he had undermined her and retaliated against her for "doing [her] job" because she "complained about his sexual harassment and retaliation." (*Id.*) She met with HR on May 3. (*Id.*, Ex. A at 84:7–16.) The same day, Grevious was notified that by Thompson that DSU was dismissing her as Chairperson, effective May 6. (*Id.*, Ex. S.) This prematurely terminated her appointment, which would have ended when the newly elected Chairperson was set to assume the position on June 1. (*Id.*, Ex. T.) She maintained her Chairperson salary until June 1. (*Id.*, Ex. S.)

---

[1] In her deposition, Grevious also claimed that Austin referred to her as "sugar," told her he could get her tenure, and on multiple occasions made comments such as "black women can't be trusted, that black women aren't qualified to make decisions, that black women aren't able to bring legitimate issues to the table." (D.I. 42, Ex. A at 59:10–15, 62:9–24.) These specific complaints were not outlined in any of her written complaints to the university.

4

On May 20, 2011, Grevious filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). (D.I. 37, Ex. 16.) She claimed that after her complaints to Thompson "about the demeaning comments that Dr. Austin made about women, Black women in particular," Austin "initiated a series of hostile actions to undermine [her] leadership and success as Chair." (*Id.*) The Defendants became aware of the EEOC Charge around June 2011. (D.I. 42, Ex. B at 9.) On June 21, 2011, Grevious received a revised, terminal employment contract. (*Id.*, Ex. W.) When she received the contract, she emailed DSU President Harry Williams, asking why she had received a terminal contract in light of her "outstanding" performance as an Associate Professor. (*Id.*, Ex. X.) She was referred to Thompson, and asked him the "basis for revoking a contract that has already been issued and signed by all parties. . . . With all things considered, it appears punitive." (*Id.*, Ex. Y.)

Grevious claims that Thompson told her that her contract was revised "in retaliation for filing the EEOC complaint, May 24, 2011, and not for anything related to teaching, service or scholarship." (*Id.*, Exs. Z–bb.) Thompson, on the other hand, claims he met with her to give her the opportunity "to present any supporting documentation to indicate that she met or exceeded professional competence in teaching, research, or professional service." (D.I. 37, Ex. 20.) After reviewing her documentation, he found "in terms of research and teaching she met at least the minimum standards," but "in terms of service she has consistently displayed an inability to work collegially with her direct reports, peers, and the persons that she reports to; this feedback was consistent across all levels." (*Id.*) Thompson claims his recommendation for a terminal contract was based on this documented interpersonal conflict. (*Id.*) Austin was not involved in the decision to offer Grevious a terminal contract. (D.I. 38, Ex. 1 at 66:10–18.)

5

On August 4, the HR notified Grevious that it was closing its investigation into her sexual harassment claims because nobody corroborated her allegations of inappropriate comments by Austin. (D.I. 37, Ex. 17.) Furthermore, during the investigation "most of the information [she] shared actually had to do more with the academic practices of the Social Work Department and staff operations, rather than the allegations of the initial complaint." (*Id.*) On September 28, Grevious filed a second EEOC Charge based on the issuance of the terminal contract. (D.I. 42, Ex. oo.)

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). A fact is material if it "could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). There is a genuine issue "if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Id.* When determining whether a genuine issue of material facts exists, the district court must view the evidence in the light most favorable to the nonmoving party and draw inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the moving party is able to demonstrate an absence of disputed material facts, the nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citing FED. R. CIV. P. 56(e)).

The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the nonmoving party must present enough evidence to enable a jury to reasonably find for it on that issue. *Id.* The party opposing summary judgment must present more than just "mere allegations, general denials, or . . . vague statements" to show the existence of a genuine issue. *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). As such, a nonmoving party must support their assertion that a material fact is in dispute by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or "(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1). The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it has the burden of proof. *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

### A. Title VII and § 1981 Framework

Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). Section 1981 also prohibits retaliation for complaints of illegal discrimination. *See, e.g., Daughtry v. Family Dollar Stores, Inc.*, 819 F.Supp.2d 393, 403 (D. Del. 2011). The substantive elements of a claim under § 1981 are generally identical to a claim under Title VII. *Brown v. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009). The court will treat these claims jointly.

7

A plaintiff's retaliation claims under Title VII and § 1981 are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff is first required to establish a prima facie case of retaliation: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Kachmar v. SunGard Data Sys.*, 109 F.3d 173, 177 (3d Cir. 1997); *see McDonnell Douglas*, 411 U.S. at 802. If the plaintiff meets this burden, the burden then shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its actions. *McDonnell Douglas*, 411 U.S. at 802. If the defendant produces sufficient reasons for its actions, the plaintiff is then required to demonstrate that the defendant's asserted rationale is pretextual. *Id.* If the plaintiff cannot carry this burden, the defendant is entitled to summary judgment. *Id.*

### B. Grevious Has Failed to Establish a Prima Facie Case of Retaliation

In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) the plaintiff engaged in activity protected by Title VII; (2) the plaintiff suffered an adverse employment decision; and (3) there was a causal connection between the protected activity and the adverse employment decision. *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005). "A defendant may defeat the claim of retaliation by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity." *Lauren W. ex. rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

The parties do not dispute that Grevious has satisfied the first two elements of the prima facie case. Grevious engaged in protected activity when she filed harassment and discrimination complaints against Austin to the Provost's Office, HR, and the EEOC. Grevious suffered at least

8

two adverse employment decisions when she was 1) removed as Chairperson and 2) offered a terminal contract. The parties' disagreement centers on whether or not Grevious can successfully establish the third element, causation.

Grevious argues that the timing between her complaints and the adverse employment actions is evidence of retaliation by the Defendants. Close temporal proximity between an employee's protected activity and the alleged retaliatory action may provide an inference of causation where the timing is unusually suggestive of retaliatory motive. *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000). But a plaintiff must still prove retaliation using but-for causation, which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013).

Grevious fails to show any causal link between her protected activity and Austin's actions. Her relationship with Austin had soured before she ever reported harassment. She first reported antagonism from Austin on January 20, 2011. She then complained that she was experiencing "retaliation" from Austin on January 27, which was the date of her first mention of harassment. Any retaliation she faced on January 27 predated her Title VII protected activity and seems to have centered on her conflicts with Austin and his management style. Throughout her complaints, Grevious echoed many of the same concerns with Austin's "interference with departmental governance." It is clear that Grevious and Austin had many disagreements regarding leadership in the department, but the aftermath of such disputes does not rise to unlawful retaliation. Because Grevious complained of retaliation from Austin before he learned of her informal complaints, it is difficult to characterize his actions as unlawful retaliation.

One form of retaliation Grevious claims occurred after her complaints is the negative Chairperson evaluation she received from Austin on February 15. It is true that Austin met with Thompson concerning her harassment allegations the day before. But the timing of this evaluation is not "unusually suggestive" of retaliation. As early as January 20, Grevious claimed that Austin had launched a campaign to remove her as Chairperson. If her allegations are taken as true, a negative evaluation would be squarely in line with Austin's desire for her removal. Thus, his animus predated her harassment claims.

Grevious also fails to establish causation for the Defendants' other adverse employment decisions. Grevious first complained of harassment on January 27, 2011. She filed a complaint with HR on April 14, and an EEOC Charge on May 20. On May 3, she was informed that her term as Chairperson was being cut short. Over three months passed between her first harassment complaint against Austin and the termination of her Chairperson position. This relatively extended period does not lead to a strong inference of retaliation. Further, the faculty had voted her out in February, making it even more difficult for Grevious to prove that the Defendants would not have removed her as Chairperson "but for" her complaints. Grevious points to the fact that her meeting with HR and her early dismissal as Chairperson coincide—both occurred on May 3. Unfortunately for her, even taking all assumptions in her favor, no reasonable jury could find this was more than coincidence. Grevious provides no evidence that Thompson or Austin knew she was meeting with HR on May 3, or that they had even received notice of her HR complaint. Without evidence of knowledge on the part of the Defendants, Grevious cannot prove causation.

On June 21, Grevious received a revised terminal contract. Austin was not involved in this decision. By this time, almost five months had passed since her first harassment complaint, rendering extremely tenuous any causation based on temporal proximity. Again, conveniently,

Grevious would like the court to draw a connection not to the date of her first complaint (or any of her numerous subsequent complaints), but to the date the Defendants received notice of the EEOC complaint, which was sometime in June. Grevious also claims that Thompson personally told her that she received the terminal complaint in retaliation for the EEOC complaint. Grevious lacks corroboration for this allegation. Further, Defendants Thompson and DSU offer a non-retaliatory explanation for their decision. A contemporaneous memorandum from Thompson (which was written before the conversation in which he allegedly told Grevious he was retaliating) indicates that the terminal contract was received because of her "inability to work collegially" with others. (D.I. 37, Ex. 20.)

To raise an issue for trial, Grevious must demonstrate that Thompson's explanation contains "weaknesses, implausibilities, inconsistencies, or contradictions" sufficient for a reasonable juror to conclude that it is a pretext for retaliation. *Rumanek v. Indep. Sch. Mgmt., Inc.*, 50 F. Supp. 3d 571, 581 (D. Del. 2014) (quoting *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). Grevious fails to do so here. Thompson's explanation is supported by ample evidence on the record that Grevious had many quarrels with her coworkers during her short time at DSU. These conflicts predated any claims of harassment or discrimination. As a matter of law, Grevious cannot show that her harassment complaints were the but-for cause of the Defendants' actions.

## V. CONCLUSION

For the reasons stated above, the court will grant the Defendants' Motion for Summary Judgment (D.I. 35.)

11

Dated: September 30, 2015

_____
UNITED STATES DISTRICT COURT